# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL PERSONAL INSURANCE COMPANY, LM GENERAL INSURANCE COMPANY, LM INSURANCE CORPORATION, LM PROPERTY AND CASUALTY INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF AMERICA, and SAFECO INSURANCE COMPANY OF ILLINOIS,<br>　　　　　Plaintiffs,<br><br>vs.<br><br>DIAGNOSTIC CHIROPRACTIC MI, PC, DIAGNOSTIC CHIROPRACTIC MI II, PC, DURAMED MI, LLC, LINT CHIROPRACTIC, PC, LINT CHIROPRACTIC II, PC, MI MEDICAL MANAGEMENT LLC, SUPPLIES PLUS MI, LLC, SUPPLIES PLUS MI II, LLC, and ROBERT SUPER, D.C.<br><br>　　　　　Defendants. | C.A. No. 2:24-cv-10831-LVP-EAS<br>HON. Linda V. Parker<br><br><br><br><br>　　　　CIVIL ACTION<br><br>**AMENDED COMPLAINT** |

42837.00101
**MARSHALL DENNEHEY**
Jeffrey G. Rapattoni, Esq. (P81455)
15000 Midlantic Drive, Suite 200 · P.O. Box 5429
Mount Laurel, NJ 08057
Phone: (856) 414-6000  Fax: (856) 414-6077
jgrapattoni@mdwcg.com
Attorney for Plaintiffs

- 1 -

DAVID J. LANKFORD (P47881)
STEVEN M. BRAUN (P79461)
Law Offices of Greig, Kennedy, Seifert and Fitzgibbons
Attorney for Plaintiffs
28411 Northwestern Hwy., Suite 640
Southfield, MI 48034
248-223-0120
Fax:  603-334-9174

---

## AMENDED COMPLAINT

This Is To Certify That No Other Civil Action Arising Out Of The Same
Transaction Of Occurrence As Alleged In This Complaint Has
Heretofore Been Commenced In This Court

By:  _____ */s/ Jeffrey G. Rapattoni*  _____
JEFFREY G. RAPATTONI (P81455)

NOW COMES Plaintiffs, LIBERTY INSURANCE CORPORATION,
LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL
PERSONAL INSURANCE COMPANY, LM GENERAL INSURANCE
COMPANY, LM INSURANCE CORPORATION, LM PROPERTY AND
CASUALTY INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF
AMERICA, and SAFECO INSURANCE COMPANY OF ILLINOIS, (herein after
collectively referred to as "Plaintiffs"), through undersigned counsel, Jeffrey G.
Rapattoni from MARSHALL DENNEHEY, and David J. Lankford and Steven

Braun from the LAW OFFICES OF GREIG, KENNEDY, SEIFERT AND FITZGIBBONS, hereby allege as follows:

## I.   **INTRODUCTION**

1.      This case involves chiropractic treatment, durable medical equipment ("DME") providers, and a scheme by the Defendants to defraud Plaintiffs by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices seeking to collect and induce payment from the Plaintiffs for treatment, and/or DME and/or services that were not actually performed, were medically unnecessary, were subject of fraudulently billing, and/or were not lawfully rendered pursuant to applicable statutes and regulations, including, but not limited to, the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.      Defendants Diagnostic Chiropractic MI, PC ("Diagnostic Chiropractic"), Diagnostic Chiropractic MI II, PC[1] ("Diagnostic Chiropractic II"), Duramed MI, LLC ("Duramed"), Lint Chiropractic, PC ("Lint"), Lint Chiropractic II, PC[1] ("Lint II"), MI Medical Management, LLC ("MI Medical"), Supplies Plus MI, LLC ("Supplies"), Supplies Plus MI II, LLC ("Supplies II"), Robert Super, D.C. ("Super") (collectively, the "Defendants") individually or together conspired to, and

---

[1] Both of these II entities operate for the sole purpose of disguising, evading and/or circumventing Plaintiffs attempts to clarify, consider and possibly to issue denials of the claimed benefits, based on the multitude of issues relating to these entities treatment options as further outlined in this complaint.

did in fact, defraud Plaintiffs by perpetuating an insurance fraud scheme in violation of Michigan law.

3.     The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from the Plaintiffs to and on behalf of the Defendants pursuant to Michigan's No-Fault Act.

4.     All of the acts and omissions of the Defendants, described throughout this Complaint were undertaken intentionally.

5.     By this Complaint, and as detailed in each count set forth below, Plaintiffs seek damages under causes of action for: (1) VIOLATION OF 18 U.S.C. § 1962(c); (2) VIOLATION OF 18 U.S.C. § 1962(d); (3) common law fraud; (4) material misrepresentation; and (5) unjust enrichment. Plaintiffs also seek declaratory relief that no previously-denied and pending insurance claims submitted to it by the Defendants are compensable.

## II.   **THE PARTIES**

### A.   **Plaintiffs**

6.     Plaintiff Liberty Insurance Corporation is an insurance company with its principal place of business in Boston, Massachusetts duly organized under the laws of Illinois that is licensed in Michigan to engage in the business of insurance.

7.     Plaintiff Liberty Mutual Fire Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts duly

organized under the laws of Wisconsin that is licensed in Michigan to engage in the business of insurance.

8.    Plaintiff Liberty Mutual Personal Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts duly organized under the laws of New Hampshire that is licensed in Michigan to engage in the business of insurance.

9.    Plaintiff LM General Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts duly organized under the laws of Indiana that is licensed in Michigan to engage in the business of insurance.

10.    Plaintiff LM Insurance Corporation is an insurance company with its principal place of business in Boston, Massachusetts duly organized under the laws of Illinois that is licensed in Michigan to engage in the business of insurance.

11.    Plaintiff LM Property and Casualty Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts duly organized under the laws of Indiana that is licensed in Michigan to engage in the business of insurance.

12.    Plaintiff Safeco Insurance Company of America is an insurance company with its principal place of business in Seattle, Washington duly organized

under the laws of Iowa that is licensed in Michigan to engage in the business of insurance.

13.     Safeco Insurance Company of Illinois is an insurance company with its principal place of business in Bellevue, Washington duly organized under the laws of Iowa that is licensed in Michigan to engage in the business of insurance.

14.     At all times relevant to the allegations contained in this Complaint, the Plaintiffs were authorized to conduct business in the State of Michigan.

**B.     Defendants**

**Diagnostic Chiropractic MI, PC**

15.     Defendant Diagnostic Chiropractic MI, PC, is a professional corporation incorporated under the laws of the State of Michigan.

16.     Diagnostic Chiropractic's principal place of business is located in Southfield, Michigan.

17.     At all relevant times, Diagnostic Chiropractic was operated and controlled by Robert Super, D.C.

18.     Diagnostic Chiropractic billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 1 [Chart – Claim Numbers]**.

**Diagnostic Chiropractic MI II, PC**

19.    Defendant Diagnostic Chiropractic MI II, PC, is a professional corporation incorporated under the laws of the State of Michigan.

20.    Diagnostic Chiropractic II's principal place of business is located in Southfield, Michigan.

21.    At all relevant times, Diagnostic Chiropractic II was operated and controlled by Robert Super, D.C.

22.    Diagnostic Chiropractic II billed Plaintiffs for services not rendered, that were not medically necessary (if they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Ex 1**.

**Duramed MI, LLC**

23.    Defendant Duramed MI, LLC, is a limited liability company organized under the laws of the State of Nevada.

24.    Defendant Duramed is a wholly owned subsidiary of Can B. Corp., which was incorporated in the State of Florida and has a principal place of business in the State of New York.

25.    At all relevant times, Duramed is believed to be operated and conducted by Defendants Diagnostic Chiropractic, Diagnostic Chiropractic II, Lint, Lint II, and Robert Super.

26.     Duramed billed Plaintiffs for services not rendered, that were not medically necessary (if they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 2** **[Chart – Claim Numbers]**.

### Lint Chiropractic, PC

27.     Defendant Lint Chiropractic, PC, is a professional corporation incorporated under the laws of the State of Michigan.

28.     Lint's principal place of business is located in Southfield, Michigan.

29.     At all relevant times, Lint was operated and controlled by Robert Super, D.C.

30.     Lint billed Plaintiffs for services not rendered, that were not medically necessary (if they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 3** **[Chart – Claim Numbers]**.

### Lint Chiropractic II, PC

31.     Defendant Lint Chiropractic II, PC, is a professional corporation incorporated under the laws of the State of Michigan.

32.     Lint II's principal place of business is located in Southfield, Michigan.

33.     At all relevant times, Lint II was operated and controlled by Robert Super, D.C.

34.    Lint II billed Plaintiffs for services not rendered, that were not medically necessary (if they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 4 [Chart – Claim Numbers]**.

## MI Medical Management Plus, LLC

35.    Defendant MI Medical Management Plus, LLC is a professional corporation incorporated under the laws of the State of Michigan.

36.    MI Medical's principal place of business is located in Southfield, Michigan.

37.    At all relevant times, MI Medical was operated and controlled by Robert Super and Lint.

38.    MI Medical billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 5 [Chart – Claim Numbers]**.

## Supplies Plus MI, LLC

39.    Defendant Supplies Plus MI, LLC is a professional corporation incorporated under the laws of the State of Michigan.

40.    Supplies' principal place of business is located in Southfield, Michigan.

41.    At all relevant times, Lint II was operated and controlled by Supplies.

42.     Supplies billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 6 [Chart – Claim Numbers]**.

**Supplies Plus MI II, LLC**

43.     Defendant Supplies Plus MI II, LLC is a professional corporation incorporated under the laws of the State of Michigan.

44.     Supplies II's principal place of business is located in Southfield, Michigan.

45.     At all relevant times, Supplies II was operated and controlled by Supplies.

46.     Supplies billed Plaintiffs for services not rendered, that were not medically necessary (if they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Ex. 6.**

**Robert Super, D.C.**

47.     Defendant Robert Super, D.C., is a resident and citizen of Florida.

48.     At all relevant times, Super owned, operated. and controlled Defendant, Lint Chiropractic, PC.

### III.   JURISDICTION & VENUE

49.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

50.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by Plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

51.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000.00 against each defendant and because it is between citizens of different states, as detailed in the foregoing section.  **Exhibit 7 [Summary of Financials]**.

52.   Supplemental jurisdiction over Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

53.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

### IV.   BACKGROUND AND DEFENDANTS' SCHEME TO DEFRAUD

54.   The scheme described by this Complaint was driven by a chiropractor, Defendant Super, who practices in Florida and who set up businesses in Michigan

in order to take advantage of the insurance benefits available under the Michigan No-Fault Act.

55.     The Defendants developed a scheme which they believed they could demand unlimited and uncapped benefits from insurers like the Plaintiffs despite the No-Fault Act's implementation of a statutory fee schedule by billing exclusively for purported services that are not covered by the No-Fault Act's fee schedule because they are experimental, unproven, and medically unnecessary.

56.     Defendants Super used Lint and Lint II to bill for purported Trigger Point Impedance Imaging ("TPII") and Localized Intense Neurostimulation Therapy ("LINT").

57.     In an effort to further the use of this device, Defendants Diagnostic Chiropractic and Diagnostic Chiropractic II would preform range of motion testing through use of JTECH inclinometer, and additional $300.00 per level and per side of the body charge for each and every level, totaling upwards of $9,900.00 per date of service.

58.     Per the Nation Correct Coding Initiative, this range of motion testing, including the use of inclinometer would typically be included billing if an examination was done, but in line with Robert Super, DC's repetitive efforts to

circumvent and bloat billing, examinations are never done with the inclinometer

testing is done and then subsequently is overbilled as it is limited by extremity[2].

59.     As to the TPII and LINT, these purported treatments consisted of

nothing more than purporting to identify and attempting to relieve trigger points

through electrical stimulation, *which are the same services typically billed by*

*physicians, chiropractors, and physical therapists for a small fraction of the amount*

*billed by the Defendants, and which services would have been subject to the No-*

*Fault Act's fee schedule if billed as such*.

60.     Purported TPII and LINT services were allegedly done using

equipment called Nervomatrix machines, which Super and Lint owed, leased, and

otherwise controlled in Michigan.

61.     Defendant Super had an exclusive contract that entitled him to

"dominion and control" over all Nervomatrix machines in the United States.

62.     Nervomatrix machines were approved for use by the Food and Drug

Administration ("FDA") as a transcutaneous electrical nerve stimulation ("TENS")

device.

---

[2] Examination of the billing for the use of the JTECH inclinometer reveals multiple charges for dual diagnoses and additional miscellaneous codes to double the billing rate Defendants Diagnostic Chiropractic and Diagnostic Chiropractic II charge for this singular date of service testing.  This method of billing is synonymous with the overall systematic and directed approach by Robert Super, DC, who testified he specifically identified Michigan after the No-Fault reform as a profitable business opportunity.

63.     The Defendants routinely submitted copies of correspondence from the FDA approving the marketing of Nervomatrix machines, but intentionally omitted the portions of the correspondence characterizing the machines as TENS devices because TENS treatment and devices are routine procedures that are covered by the No-Fault Act's fee schedule and paid at a tiny fraction of the amount billed by the Defendants.

64.     Defendants Super and Lint installed Nervomatrix machines at an office set up by Lint in Michigan and at offices of several different physicians, chiropractors, and physical therapy providers in Michigan for the purported TPII and LINT services rendered using the Nervomatrix machines.

65.     On each date the Defendants claimed to render TPII and LINT services, they charged at least $3,990 and as much as $7,200.00 for these experimental and unproven procedures.

66.     Defendants Lint, Super, and their associates also prescribed medically unnecessary DME as a matter of course and was also designed to avoid the No-Fault Act's fee schedule.

67.     Defendants Lint, Super and their associates monetized the unnecessary alleged provision of TPII and LINT services through at least three (3) methods: (1) renting Nervomatrix machines to other providers; (2) directly billing Liberty Mutual for TPII and LINT through entities controlled by Super; and (3) purchasing accounts

receivable for alleged TPII and LINT services from other providers for a fraction of the amount billed to insurers.

68.     The Defendants intentionally installed their Nervomatrix machines in clinics that have a lengthy history of abuse of Michigan's No-Fault system.

69.     For example, Super leased several Nervomatrix machines to physical therapy clinics owned and controlled by Norman Dehko and his family, including Level One Health Systems of Michigan, LLC ("Level One"), Michigan First Rehab, LLC ("Michigan First"), and Therapy Professionals, LLC ("Therapeutic Professionals").

70.     In 2007, Norman Dehko, along with his mother, Latifa Dehko, and his brother, Dickow Dehko, were arrested and charged with insurance fraud in connection with a scheme that involved falsification of reports and enhancing collision damage. [**EXHIBIT 8 – Ins. Article**]

71.     Norman Dehko, who was described as the ringleader of the scheme, was charged with forty (40) felonies, and was alleged to have used as many as twelve (12) separate auto body shops to perpetrate the fraud.

72.     In 2012, Norman Dehko pleaded guilty to insurance fraud conspiracy.

73.     Norman Dehko has also been implicated in a scheme in which a former Detroit police officer was convicted of misconduct in office for, *inter alia*, creating

falsified police reports for Norman Dehko and others. *See* State of Michigan v. Schuh, No. 08-013141-FH, Wayne Circuit Court.

74.     The convicted officer admitted that he had received between five and seven thousand dollars in "loans" from collision shop owners that had no payback arrangement, and that were not in fact paid back.

75.     Norman Dehko, who is a layperson, has continued to direct purported treatment of patients who claim to have been in motor vehicle accidents by identifying such patients through his family's auto body shops and directing them to clinics owned by himself and his family members, including the clinics listed above at which the Defendants installed Nervomatrix machines.

76.     The records and bills that were prepared, faxed, and mailed on behalf of the Defendant entities confirm that the Defendants intended to specifically target uncapped and non-fee-scheduled purported treatments by emphasizing that bills were for services not covered by the No-Fault fee schedule and that they would not accept reductions in payment amounts.

77.     As a result of these relationships and associations, the Defendants had a significant financial motivation to bill the Plaintiffs as much as possible, all at unconscionable rates and regardless of medical need and applicable standards of care.

78.    The invoices, bills, medical records and all other documentation submitted in support of Defendants' request for reimbursement contained materially false and/or misleading statements.

79.    The fraudulent services include, but are not limited to, *the over-diagnosis, protocol treatment, embellished evaluation and management, patterns of abnormal treatment, repetitive and excessive patterns of treatment and fraudulent reporting of patient improvement, diagnoses and recommendations falling below the standard of care, patterns of boilerplate language in subjective, objective, and physical examination findings falling below the standard of care.*

80.    In addition, Defendants made *material misrepresentations* regarding the alleged severity of the insured's presenting medical problems, the amount of time spent on initial and follow-up examinations, the extent of medical decision-making made during initial and follow-up examinations which were designed to be utilized to support continued treatment under the Defendants' care.

## V.    BILLING FOR SERVICES NOT RENDERED

81.    The Defendants regularly submitted bills to the Plaintiffs seeking payment for treatment and services that were never rendered to patients at issue herein.

82.    The Defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as

large as, and as many bills for payment, as possible regardless of whether the treatment was actually rendered and whether it was medically necessary.

83.     All of the bills submitted by the Defendants to the Plaintiffs through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

84.     Plaintiffs are not required to pay the Defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the Defendants as a result of their fraudulent billing for services not rendered.

## VI.     FRAUDULENT, UNNECESSARY, AND EXCESSIVE TREATMENT

85.     The Defendants' intent and willingness to falsify records and to bill for services that were never rendered, services that were based on forged and fabricated prescriptions and records, and services that were rendered unlawfully demonstrates their intent and willingness to also bill for treatment that was unreasonable and unnecessary.

86.     The Defendants' goal was to bill for as much treatment as possible, for as long as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or whether such treatment arose out of an alleged motor vehicle accident, in order to generate bills to the Plaintiffs.

87.     The Defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

88.     The full extent of the Defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to the Plaintiffs until Plaintiffs undertook a fuller investigation that culminated in the filing of this action.

89.     Plaintiffs are not required to pay the Defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the Defendants' fraud.

90.     None of the above facts were known to the Plaintiffs until Plaintiffs undertook a detailed investigation that resulted in the commencement of this action, and are/were evident within the four corners of the medical records and bills submitted to the Plaintiffs by the Defendants.

**Unnecessary TPII And Lint**

91.     As part of the Defendants' predetermined protocol, patients were immediately scheduled for TPII and LINT services in order to quickly generate massive bills to the Plaintiffs.

92.     TPII and LINT services were then repeated many times to each patient without the Defendants attempting to make any determination as to whether the purported treatment benefited patients.

93.     In order to falsely justify the excessive and unnecessary TPII and LINT treatment billed to the Plaintiffs, Lint, Super, and their associates initially utilized his business relationship with the Dheko family and their facilities to generate prescriptions specifically for TPII treatment.

94.     In particular, one of these physicians, Dr. Pedro Toweh had to send a signed letter to the Michigan Attorney General's office verifying the forged prescriptions in his name. [**EXHIBIT 9 – Letter from Dr. Pedro Toweh**].

95.     Defendant Super, then transitioned to inner office prescriptions for treatment always diagnosed patients with myofascial pain syndrome with pain in either the thoracic or lumbar region, which are vague and non-specific diagnoses designed only to create the appearance of necessity for the treatment billed by the Defendants.

96.     Illustrative, but not exclusive, of Defendants' actions:

    a.  K.B. (claim no.: 044339054) was a restrained driver involved in a motor vehicle accident on 11/15/20. On 3/3/21, he began receiving services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia". He underwent four of these treatments over the course of three months. On four dates of service from 3/3/21 through 6/8/21, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" (FDA Identification Number

K100668). This service consists of two components: the diagnostic component, and the treatment of the trigger points. There are no CPT codes specific to these two services. CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance. CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. The treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. The reports listed generic details of the treatment and how it is performed, along with an explanation of the scientific background and the medical necessity. There was no patient-specific information other than K.B.'s demographics; Dr. Super's signature on the treatment note would imply that he saw and treated this patient; however, there was nothing specific documented to suggest that he examined the patient or even spoke with him. There were no specific complaints noted, and no examination findings were documented. It was not noted if the treatment was effective or if K.B. received any pain relief that would justify continued treatment.

b. K.B. (claim no.: 044856637) was a restrained driver involved in a motor vehicle accident on 2/21/21. On 5/3/21 and 6/1/21, she received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia". (FDA Identification Number K100668). On both dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in K.B.'s case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. K.B.'s treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than K.B.'s demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if K.B. received any pain relief that would justify continued treatment.

c. A.M. (claim no.: 044789017) was a restrained driver involved in a motor vehicle accident on 2/16/21. On 3/22/21, she began receiving

services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia". (FDA Identification Number K100668). She underwent five of these treatments over the course of three months. On all four dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in A.M.'s case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. The treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. The reports listed generic details of the treatment and how it is performed, along with an explanation of the scientific background and the medical necessity. There was no patient-specific information other than A.M.'s demographics, there were no specific complaints noted; it was not noted if the treatment was effective or if A.M. received any pain relief that would justify continued treatment.

d. D.D. (claim no.: 051259533) was a restrained driver involved in a motor vehicle accident on 10/17/22. On 10/25/22, 11/1/22, 11/4/22, 11/8/22, 11/16/22, 11/18/22, 11/21/22, 11/22/22, 11/29/22, 12/8/22, 1/23/23, 1/24/23, 2/8/23, and 5/3/23, she received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668). These dates of service were based on the prescription from Julie Strief, D.C., who in her deposition testified she has no specific understanding of how the Nervomatrix diagnosis and treats patients and is utilized as a pre-determined treatment. On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in D.D.'s case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. D.D.'s treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than D.D.'s demographics, there

were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if D.D. received any pain relief that would justify continued treatment.

e.  D.N. (claim no.: 051259533) was a restrained driver involved in a motor vehicle accident on 10/17/22. On 10/19/22, 10/21/22, 10/24/22, 10/25/22, 11/3/22, 11/4/22, 11/8/22, 11/10/22, 11/15/22, 11/17/22, and 11/22/22, she received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668). These dates of service were based on the prescription from Julie Strief, D.C., who in her deposition testified she has no specific understanding of how the Nervomatrix diagnosis and treats patients and is utilized as a pre-determined treatment. On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in D.N.'s case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. D.N.'s treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than D.N.'s demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if D.N. received any pain relief that would justify continued treatment.

f.  A.W. (claim no.: 051259533) was a restrained driver involved in a motor vehicle accident on 1/6/22, 1/7/22, 1/13/22, 1/14/22, 1/17/22, 1/18/22, 1/20/22, 3/31/22, 4/13/22, and 5/24/22, she received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668). The first dates of service were based on the prescription from Julie Strief, D.C., who in her deposition testified she has no specific understanding of how the Nervomatrix diagnosis and treats patients and is utilized as a pre-determined treatment. On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in

A.W.'s case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. A.W.'s treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than A.W.'s demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if A.W. received any pain relief that would justify continued treatment.  In addition to the Nervomatrix treatment, Defendant Supplies dispensed a NICE1 Recovery Cold Compression Unit and Wrap (FDA Identification Number K143197), which per the FDA filing requires a prescription.  In that regard under MCL 333.17748, Defendant Supplies is required to hold a wholesale distributor license, which renders all billing unlawful.

g. M.M. (claim no.: 050879648) was a restrained driver involved in a motor vehicle accident on 6/28/22. On 10/19/23, 10/24/22, 11/1/22, 11/4/22, 11/7/22, 11/8/22, 11/14/22, 11/15/22, 11/21/22, 11/28/22, 12/1/22, 12/6/22, 12/7/22, 1/9/23, 1/10/23, 1/16/23, 1/17/23, 1/24/23, 1/25/23, 1/30/23, 2/1/23, 2/6/23, 2/7/23, 2/14/23, 2/15/23, 3/15/23, 3/16/23, 3/20/23, 3/27/23, 3/28/23, 4/6/23, 4/10/23, 4/11/23, 4/18/23, 4/19/23, and 4/24/23, he received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668).  On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in M.M. 's case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. M.M. 's treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than M.M. 's demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if M.M. received any pain relief that would justify continued treatment.

h. P.B. (claim no.: 050879648) was a restrained driver involved in a motor vehicle accident on 6/28/22. On 9/14/22, 10/14/22, 10/19/22, 10/31/22, 11/1/22, 11/7/22, 11/8/22, 11/14/22, 11/15/22, 11/21/22, 11/22/22, 12/26/22, 12/27/22, 1/2/23, 1/3/23, 1/9/23, 1/10/23, 1/16/23, 1/17/23, 1/23/23, 1/24/23, 1/30/23, 2/1/23, 3/6/23, 3/7/23, 3/15/23, 3/21/23, 3/27/23, 3/29/23, 3/31/23, 4/3/23, 4/4/23, and 4/10/23, he received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668).  The first dates of service were based on the prescription from Julie Strief, D.C., who in her deposition testified she has no specific understanding of how the Nervomatrix diagnosis and treats patients and is utilized as a pre-determined treatment. On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in P.B. 's case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. P.B. 's treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than P.B. 's demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if P.B. received any pain relief that would justify continued treatment.

i. M.P. (claim no.: 049304046) was a restrained driver involved in a motor vehicle accident on 4/26/22. On 7/11/22, 7/20/22, 7/25/22, 7/27/22, 8/1/22, 8/17/22, and 8/22/22, he received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668). none of these dates though were prescribed by approved medical personnel as required by the FDA 501K Application—Indications for Use.  On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in P.B. 's case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the

electrical stimulation treatment, the localized intense hyper stimulation analgesia component. P.B. 's treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than P.B. 's demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if P.B. received any pain relief that would justify continued treatment. Similar issues are raised with the JTECH inclinometer (FDA Identification Number K954647) treatment performed on 5/18/22, 7/20/22, 8/31/22, and 9/28/22. This device is classified under orthopedic/neurology and is being performed by a technician, Cory Borawski, DC, who does not appear on the records—similar to the Nervomatrix treatment where Robert Super, DC, having performed none of the diagnostic testing or treatment is the supposed author of the records—and makes no findings or assessments from the alleged readings. Finally, the billing for these services is in direct violation of the National Correct Coding Initiative as identified above.

j.  B.P. (claim no.: 049304046) was a restrained driver involved in a motor vehicle accident on 4/26/22. On 5/23/22, 5/25/22, 6/7/22, 6/8/22, 6/15/22, 6/20/22, 6/21/22, 6/27/22, 7/11/22, and 7/13/22, he received services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia." (FDA Identification Number K100668). none of these dates though were prescribed by approved medical personnel as required by the FDA 501K Application—Indications for Use. On all these dates of service, Dr. Robert Super billed for services identified as "Trigger Points Impedance Imaging" and "Localized Intense Hyperstimulation Analgesia" with CPT code 95999 and 99199, respectively. Again in P.B. 's case, CPT code 99599 was used for the diagnostic component of the treatment, to determine the location of areas of low resistance and CPT code 99199 was used to report the electrical stimulation treatment, the localized intense hyper stimulation analgesia component. P.B. 's treatment reports were identical on each date, with the exception of the trigger points noted on the impedance and treatment maps. There was no patient-specific information other than P.B. 's demographics, there were no specific complaints or examination findings noted; it was not noted if the treatment was effective or if P.B. received any pain relief that would justify continued treatment. Similar issues are raised with the JTECH inclinometer (FDA Identification Number K954647)

treatment performed on 5/18/22, 6/15/22, 7/20/22, 9/28/22, and 10/26/22.  This device is classified under orthopedic/neurology and is being performed by a technician, Cory Borawski, DC, who does not appear on the records—similar to the Nervomatrix treatment where Robert Super, DC, having performed none of the diagnostic testing or treatment is the supposed author of the records—and makes no findings or assessments from the alleged readings.  Finally, the billing for these services is in direct violation of the National Correct Coding Initiative as identified above.

97.     The deposition testimony of former Lint employee, Julie Ann Strief, D.C., illustrates protocol treatment. [**EXHIBIT 10 - Deposition of Julie Ann Strief**]

98.     Ms. Strief stated that the Nervomatrix machine was already pre-determined for treatment use as a preparatory process, <u>before</u> manual chiropractic adjustments were administered on patients. **Id**.

99.     Ms. Strief admitted she had no specialized or specific training on how to operate the Nervomatrix machine. **Id**.

100.    The Defendants regularly billed the Plaintiffs over $4,000 per date of alleged service to purportedly identify trigger points using TPII.

101.    Trigger points are areas of taut muscle bands or palpable knots of the muscle that are painful on compression.

102.    Trigger points are very easily identified through normal evaluations, including manual palpation, and TPII is not medically necessary to assess the presence of a trigger point.

103.   According to the Defendants, TPII evaluation was billed "to confirm the diagnosis of myofascial pain syndrome and identify and localize myofascial trigger points."

104.   To the extent that the Defendants evaluated patients at all before setting them on courses of TPII and LINT to generate tens of thousands of dollars in bills, their chiropractors and physicians purported to diagnose trigger points themselves without the necessity of a Nervomatrix machine or a $4,000 additional (and repeated) charges.

105.   Most patients at issue herein were also already receiving in-office myofascial release treatment.

106.   Moreover, a "syndrome" is simply a group of symptoms and not a specific diagnosis that can be confirmed at all.

107.   Purported TPII evaluations were also billed by the Defendants multiple times per patient without any explanation as to why these purported syndromes needed to be reconfirmed and without any reason to suspect that patients' conditions had changed.

108.   Aside from being purportedly necessary for Nervomatrix machines to generate bills for unnecessary LINT treatments, the TPII measurements allegedly taken by the Defendants were not incorporated into any other aspect of patients' treatment plans.

109.   In addition to being easily identified by routine manual evaluations, trigger points can be and routinely are addressed with simple treatments such as massage, application of cold packs, application of hot moist packs, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and a variety of other methods.

110.   There is no evidence that LINT provides any therapeutic benefit beyond traditional methods of chiropractic treatment and physical therapy.

111.   Most patients at issue herein were already undergoing traditional physical therapy or chiropractic treatment at the time LINT treatment was ordered and billed, making such purported treatment redundant and unnecessary.

112.   Defendants rarely recorded patients' subject, nor objective reactions to treatment, making it impossible to determine what effect, if any, treatment had on patients or whether there was a basis to continue treatment or alter patients' treatment plans.

113.   Not only did Defendants bill the Plaintiffs for excessive and medically unnecessary when compared to patients' overall clinical pictures, they also billed for alleged treatment that was not indicated by their own standards and the standards of the manufacturer of the Nervomatrix machines.

114.   The Defendants billed for many times this amount of treatment to multiply their charges to the Plaintiffs.

115.   The lack of medical necessity of TPII and LINT services is further evidenced by the fact that the purported treatments were allegedly administered by a wide variety of practitioners who did not have any specialized chiropractic training or training in the use of Nervomatrix machines.

116.   Defendants issued and billed the Plaintiffs as part of a predetermined treatment protocol, and not to address the specific conditions or treatment needs of the patient, is not payable under the Michigan No-Fault Act.

117.   Medical providers like the Defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

118.   The Defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Liberty Mutual for medically unnecessary and excessive services and used fraudulent billing practices.

119.   All of the medical records, bills, and invoices submitted to Liberty Mutual by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

120.   By utilizing CPT and HCPCS codes to submit billing to Liberty Mutual, the Defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they chose.

121.   The Defendants never communicated to the Plaintiffs that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the American Medical Association ("AMA") and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

122.   The Plaintiffs reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the Defendants.

123.   The bills submitted to the Plaintiffs by the Defendants were submitted on Health Insurance Claim Forms ("HCFA") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

124.   Despite the warning on the back of the HCFA forms, the Defendants included false, incomplete, and misleading information in the bills and medical records and submitted them to the Plaintiffs to induce payment of fraudulent services.

## VII.   FRAUDULENT, EXCESSIVE, AND UNREASONABLE CHARGES

125.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

126.   The Defendants routinely billed the Plaintiffs at rates that were unreasonable and had no relation to the services allegedly performed.

127.   The Defendants knew that the amounts they billed the Plaintiffs were unreasonable at the time the charges were submitted and intentionally billed these excessive and unreasonable amounts as part and in furtherance of their scheme to defraud the Plaintiffs by inducing them to pay the Defendants monies they were not entitled to receive.

128.   The potential of receiving a windfall to which they were not entitled by charging unreasonable and excessive amounts also motivated the Defendants' decision to bill the Plaintiffs for treatment not rendered and unlawful and unnecessary treatment, and was their motivation to resort to fraudulent billing practices.

129.   Through Defendants fraudulent actions and conduct, the Plaintiffs were harmed even when they did or did not pay the unreasonable and excessive amounts charged by the Defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

130.   The Defendants billed for alleged TPII using CPT code 95999 for as much as $4,787.50 and LINT using CPT code 99199 for as much as $1,350.00.

131.   Both CPT code 95999 and 99199 are unlisted procedure codes.

132.   There are multiple factors to consider when determining the proper charges for unlisted procedures, including the nature of the service provided and its necessity based on the documentation and the relative value of similar treatments.

133.   For the purposes of litigation, Plaintiffs retained expert Bruce Serven, DC, CCSP, who rendered opinions and made observations regarding the TPII and coding and the billing for the same.

134.   The Defendants, particularly Dr. Super, failed to provide any comparable CPT codes for the services delivered, the most common charge identified is $4,787.50 on each date of service om which TPII was delivered.

135.   Dr. Serven opined that Defendants coding of procedures were not consistent with the usual customary guidelines, thus, creating a significant deviation from the CPT Guidelines as set form in CMS.

136.   Furthermore, Dr. Serven observed Defendants' diagnostic labelling was not consistent with standards commonly seen in the chiropractic profession.

137.   Specifically, Dr. Serven found Defendants consistent use of the same diagnostic codes for each patient was a deviation from the standards of care established by ICD-10 guidelines.

138.   For the vast majority of cases reviewed there was no actual referral from any type of treating physician on file or submitted containing documentation for the procedures the Defendants performed.

139.   In short, the Defendants performed TPII and LINT procedures on patients without referral(s) from a licensed physician or other treating medical provider.

140.   Yet another observation made, was Defendants repeated use of template form documentation for all of the services rendered.

141.   Through the use of template form documentation, there was virtually no change from the initial dates of service from patient-to-patient resulting in almost the same exact verbiage on each date of service for each patient.

142.   Dr. Serven noted the only change in documentation was the mapping of trigger points identified by the Nervomatrix on each individual date along with the name of the patient at the header on the first page of the date of service.

143.   Otherwise, Defendants engaged in the cloning of daily office notes from service date-to-service date.

144.   Equally troubling, Dr. Serven discovered Defendants' daily office notes were not signed by the individual technicians or chiropractors that performed the service.

145.   Dr. Super, while residing in Florida, was able to physically sign for services being performed in Michigan.

146.   Dr. Super cannot state with any reasonable degree of certainty that he actually performed services he is purported to have rendered.

- 34 -

147.   Therefore, the signature blocks on the medical records and insurance claim forms are fraudulent and not accurate.

148.   Furthermore, Defendants continuously billed and utilized COVID-19 supply CPT code 99072.

149.   However, there was no indication within the daily office notes that any COVID-19 supplies were dispensed and/or utilized.

150.   Again, Defendants billing and utilization of COVID-19 supply codes were fraudulent and not accurate.

### Excessive Charges for TPII Services

151.   Nervomatrix machines are classified as "stimulator, nerve, transcutaneous for pain relief" according to the FDA and are intended for use as a "Transcutaneous Electrical Nerve Stimulation (TENS) for back pain relief."

152.   Typically, as part of the service associated with the application of TENS to a patient, a qualified health care provider would perform a pre-service assessment in order to determine the location of trigger points and apply TENS based on the outcome of that assessment.

153.   As such, this pre-service would be included in the TENS therapy and would not be billed as a separate service, making billing for TPII entirely improper, the practice of which should be disallowed.

## Excessive Charges for LINT Services

154.  Literature addressing Nervomatrix machines describe them as multiphasic with varying degrees of frequency applied to a concentrated specific targeted area that is performed in the presence of a qualified attendant who can make adjustment to the settings in response to the patient's tolerance of the procedure.

155.  As such, in determining similar treatment to LINT for billing purposes, CPT code 97032 ("manual electrical stimulation to one or more areas, each 15 minutes") is comparable to the alleged LINT treatments billed by the Defendants.

156.  For the purposes of litigation, Plaintiffs retained the services of nurse consultant, Tami Rockholt, RN, BSN, who opined Defendants' billing practices rose to the level of abusive billing and coding practices.

157.  The Defendants' charges are patently unreasonable and the Defendants cannot sustain their burden of proving otherwise.

## VIII.  MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY LIBERTY MUTUAL

### A.  MISREPRESENTATIONS BY THE DEFENDANTS

158.  To induce the Plaintiffs to pay promptly their fraudulent charges, the Defendants submitted and caused to be submitted to the Plaintiffs false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the

charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

159.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

160.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

161.   Thus, every time the Defendants submitted bills and medical records to the Plaintiffs supporting their claims for No-Fault benefits, the Defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

162.   The Defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

163.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

164.   The foregoing facts – including billing for services not rendered, forging and falsifying medical records, billing for treatment without a license, using a predetermined treatment protocol to generate charges for unnecessary services, and

misrepresenting the necessity of treatment, testing, and devices – were not, and could not have been, known to the Plaintiffs until it commenced its investigation of the Defendants shortly before the filing of this action.

165.   The prevalence of such facts and the Defendants' failure to abide by accepted standards of care render the treatment and testing by the Defendants unnecessary and unlawful.

166.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Liberty Mutual by, on behalf of, or with the knowledge of the Defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

167.   Each HCFA submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

168.   The Defendants routinely misrepresented the severity of the insureds presenting problems, the nature and extent of physical examinations and the complexity of the medical decision making required by the examinations in order to induce billing of fraudulent TPII and LINT services.

169.   Through the submission of patient records, invoices, HCFAs, and other medical documentation to the Plaintiffs via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, DME, and ancillary services for which they billed Liberty Mutual.

170.   Therefore, the Defendants do not have, and never had, any right to be compensated for fraudulent services that they billed or caused to be billed to the Plaintiffs.

**B.  LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE**

171.   The facially valid documents submitted to the Plaintiffs by the Defendants  were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

172.   At all relevant times, the Defendants concealed from the Plaintiffs facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Liberty Mutual from discovering that the claims submitted by and on behalf of the Defendants were not compensable under the No-Fault Act.

173.   These   misrepresentations   include   submitting   false   medical documentation, including HCFAs, documenting the fact, lawfulness, and necessity

of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

174.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and the Plaintiffs began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

175.   Due to the Defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, the Plaintiffs did not and could not have discovered that its damages were attributable to fraud until before it filed this Complaint.

176.   In reliance on the Defendants' misrepresentations, the Plaintiffs paid money to the Defendants to Plaintiffs' detriment.

177.   The Plaintiffs would not have paid these monies had the Defendants provided

true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

178.   As a result, the Plaintiffs incurred costs in adjusting the insurance claims submitted by the Defendants and paid money to the Defendants in reasonable reliance on the false medical documentation and false representations regarding the Defendants' eligibility for payment under the Michigan No-Fault Act.

179.   The Plaintiffs seek, inter-alia, an Order by reason of material misrepresentations, services not rendered and other medical practice violations to be set forth, that the Plaintiffs have no duty to provide No-Fault benefits to any Defendants hereto. Moreover, the Plaintiffs are entitled to restitution with regard to any such benefits paid or previously provided.

## IX.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

180.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

181.   The objective of the scheme to defraud Plaintiffs, which occurred throughout the period noted in **Exhibits 1 through 6**, was to collect No-Fault benefits to which the Defendants were not entitled because the medical services and DME provided, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

182.   Specifically, Defendant Super testified that he identified Michigan as an economic boon for him after the No-Fault Act was amended in June of 2019 by utilizing treatment and services that would fall specifically into miscellaneous codes that would circumvent the fee schedule.

183.   This objective necessarily required the submission of bills for payment to Plaintiffs.

184.   Defendants   created,   prepared   and   submitted   false   medical documentation and placed in a post office and/or authorized depository foir mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

185.   All documents, medical records, notes, reports, HICFs, medical diagnoses letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

186.   All medical records and bills submitted through interstate wires by Defendants were faxed from Defendants in Michigan to Plaintiffs in Pennsylvania and Massachusetts.

187.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of the claim and insurance payments.

188.   It was foreseeable to Defendants that faxing bills and medical records to Plaintiff would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Plaintiffs.

189.   Every payment at issue in this complaint where Plaintiffs were induced to rely on Defendants' false medical records and bills were tendered via a check mailed by Plaintiffs using the U.S. Mail.

190.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

191.   As detailed, Defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Plaintiffs via fax or mail related to each exemplar patient discussed in this complaint.

192.   It was within the ordinary course of business for Defendants to submit claims for No-Fault payment to insurance carriers like Plaintiffs through faxes and the U.S. Mail.

193.   Moreover, the business of billing for medical services by each of the entity Defendants at issue herein is regularly conducted by fraudulently seeking payment to which each Defendant clinic is not entitled through the use of fraudulent communications sent via faxes and U.S. Mail.

194.   In other words, discrete (claim-and-patient specific) instances of mail and wire fraud are regular way of doing business for each of the entity Defendants.

195.   The entity Defendants, at the direction and with the knowledge of their owners and managers (including Defendant Super who identified Michigan as an economic boon for himself and his attorney, non-party Richard Geller), continue to submit claims for payment to Plaintiffs and, in some instances, continue to commence litigation against Plaintiffs seeking to collect on unpaid claims.

196.   Thus, Defendants' commission of mail and wire fraud continues and will continue into the future.

197.   As all of Defendants name herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Plaintiffs by seeking payment for services that are not compensable under the Michigan No-Fault Act, Defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

198.   As several of Defendants herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

199.   Plaintiffs reasonably relied on the submissions it received from Defendants, including the submissions of claims set forth in **Exhibits 1 through 6** annexed hereto and identified in the exemplar claims above.

200.   As Defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Plaintiffs' damages.

## X.    DAMAGES

201.   The fraudulent conduct by the Defendants injured the Plaintiffs in its business and property by reason of the aforesaid violations of law.

202.   For the reasons set forth in this Complaint, the Plaintiffs seek compensatory damages against the Defendants for the amounts Plaintiffs have paid to them and paid because of them and their conduct.

203.   The Plaintiffs also seek damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the Defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the Defendants.

204.   The Plaintiffs investigated each of the Defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each Defendant.

## COUNT I
## VIOLATION OF 18 U.S.C. § 1962(c) (DEFENDANTS ENTERPRISE COLLECTIVELY) AGAINST DEFENDANTS

205.   The Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

206.   Defendants collectively constitute an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

207.   In connection with each of the claims identified in the within Complaint, Defendants intentionally caused to be prepared, faxed, and mailed false medical documentation, or knew that such false medical documentation would be faxed and mailed in the ordinary course of each facility's business, or should have reasonably foreseen that the mailing of such false medical documentation by each facility would occur, in furtherance of the Defendants' scheme to defraud.

208.   Defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Plaintiffs on certain dates, including, but not limited to, mailing of the claims identified in the charts attached.  (**Exs. 1 through 6**).

209.   As documented above, Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Plaintiffs for medical services that were purportedly performed by each entity, which they knew would be billed by the respective facility, in order to wrongly collect payment from Plaintiffs under applicable provisions of the Michigan No-Fault Act.

210.   Defendant Super owned, managed, and controlled Defendant Lint and was responsible for all actions taken by Defendants Lint, Lint II, Diagnostic Chiropractic, Diagnostic Chiropractic II, MI Medical, Supplies, and Supplies II.

211.   Defendants Duramed, Supplies Plus, and Super issued unlawful and unnecessary DME to patients of Defendants Lint and Lint II, which was used to create the appearance of injury and support for bills submitted by Defendants Lint and Lint II.

212.   Defendant Diagnostic Chiropractic and Diagnostic Chiropractic II submitted bills for medically unnecessary ROM and muscle testing, the results of which were used to create the appearance of injury to Defendants Lint and Lint II patients and support for bills submitted by Defendants Lint and Lint II.

213.   Based on these fictitious injuries and need for treatment by the other Defendant entities, Defendants Lint and Lint II utilized the NervoMatrix device through unlicensed and unsupervised technicians in almost all cases there providing Defendants Lint, Lint II, and Super with revenue to perpetuate the fraudulent scheme described herein.

214.   Defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted each facility to continue providing unlawful treatment, if provided at all.

215.   As a result of, and in reasonable reliance on, these intentionally misleading documents and representations, Plaintiffs by its agents and employees, issued payment drafts to Defendants that would not otherwise have been paid.

216.   The Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiffs' damages and injuries.

217.   By virtue of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d), ETC. (DEFENDANTS ENTERPRISE COLLECTIVELY) AGAINST DEFENDANTS

218.   The Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

219.   Defendants conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of each named facility that rendered/provided treatment/services.

220.   Defendants each agreed to further, facilitate, support, and operate Defendants enterprise.

221.   As such, Defendants conspired to violate 18 U.S.C. § 1962(c) through means of direct solicitation and referral of each patient to each entity alleging that it provided treatment and/or services.

- 48 -

222.   The purpose of the conspiracy was to obtain insurance payments from Plaintiffs on behalf of each entity even though said entity was not eligible to collect such payments by virtue of its unlawful conduct.

223.   Defendants were aware of this purpose and agreed to take steps to meet the enterprise's conspiracy objectives, including the creation and submission of claims for No-Fault benefits to Plaintiffs and medical records containing misrepresentations arising from the unlawful and unprovided alleged treatment/services.

224.   Plaintiffs have been injured in their business and property by reason of this conspiratorial conduct in that Plaintiffs have been induced to make insurance payments to Defendants as a result of each entity's and person's unlawful conduct as set forth above.

225.   By virtue of the Defendants' violation of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiffs, entitling Plaintiffs to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of each entity, and others acting in concert with them, together with the costs of this lawsuit, including reasonable attorney's fees.

## COUNT III
**COMMON LAW FRAUD**
**Against All Defendants**

226.   The Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

227.   The scheme to defraud perpetrated by the Defendants was dependent upon a succession of material misrepresentations of fact that the Defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

228.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to the Plaintiffs and concealed material facts from the Plaintiffs in the course of their submission of fraudulent charges seeking payment for fraudulent services.

229.   The false and fraudulent statements of material fact and acts of fraudulent concealment including representations that the fraudulent services were medically necessary, when in fact they were not, the engagement of pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the defendants, and representations that the fraudulent services provided were in compliance with the laws and regulations for No-Fault reimbursement, when in fact they were not, constitute fraudulent conduct.

230.   The Defendants intentionally made the above-referenced false and fraudulent statements and concealed material facts in a calculated effort to induce the Plaintiffs to pay charges that were not compensable under Michigan No-Fault law.

231.   The Plaintiffs justifiably relied on these facts, fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business by the fraudulent invoices, bills, other documents, and demands for payment the Defendants submitted.

**WHEREFORE**, the Plaintiffs seek judgment as follows:

a.  Declaring that the Defendants are not entitled to No-Fault benefits from the Plaintiffs;

b.  Awarding Plaintiffs compensatory damages, including, but not limited to, all prior No-Fault benefits paid;

c.  Permanently staying any proceedings pending within the Circuit Court, and/or with any other tribunal involving the claims for No-Fault benefits by or associated with the Defendants and enjoining said Defendants from filing new proceedings to collect No-Fault benefits from the Plaintiffs;

d.  Vacating all awards against the Plaintiffs and in favor of the Defendants entered with the Circuit Court, or any other tribunal action;

e.  Staying the enforcement of all Arbitration Awards and Judgments that the Defendants have obtained against the Plaintiffs;

f.  Granting any other relief that the Court deems fair and appropriate.

## <u>COUNT IV</u>
## MISREPRESENTATION
### Against All Defendants

232.  The Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

233.  The Defendants knowingly submitted  false, untruthful, fraudulent and misleading billing, treatment and testing records in which the Defendants, among other misrepresentations:

 i.  Falsely represented that TPII, LINT, and DME services were medically necessary and reasonable for the treatment of patients.

 ii.  Knowing performed TPII, LINT, and DME services in such a matter as to misrepresent the clinical condition of the patient.

 iii.  Knowingly performed TPII, LINT, and DME services below acceptable standards of care.

 iv.  Knowingly used patterns of boilerplate language in medical reports as to induce excessive and repetitive medical treatment.

234.  The Defendants' actions were undertaken for the purpose of defrauding the Plaintiffs by the submission of false, fraudulent and misleading claims for the payment of No-Fault benefits.

235.   In   reasonable   reliance   upon   the   Defendants'   actions   and representations, both direct and implied, the Plaintiffs issued payment of No-Fault benefits to the Defendants.

**WHEREFORE**, the Plaintiffs seek judgment as follows:

a.   Declaring that the Defendants are not entitled to No-Fault benefits from the Plaintiffs;

b.   Awarding Plaintiffs compensatory damages, including, but not limited to, all prior No-Fault benefits paid;

c.   Permanently staying any proceedings pending within the Circuit Court, and/or with any other tribunal involving the claims for No-Fault benefits by or associated with the Defendants and enjoining said Defendants from filing new proceedings to collect No-Fault benefits from the Plaintiffs;

d.   Vacating all awards against Liberty Mutual and in favor of the Defendants entered with the Circuit Court, or any other tribunal action;

e.   Staying the enforcement of all Arbitration Awards and Judgments that the Defendants have obtained against the Plaintiffs;

f.   Granting any other relief that the Court deems fair and appropriate.

**COUNT V**
**UNJUST ENRICHMENT**
**Against All Defendants**

236.   The Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

237.   Defendants have submitted, and continue to submit, bills and demands for payment to the plaintiffs for services allegedly and fraudulently rendered.

238.   Acting in good faith, the Plaintiffs received documentation for services rendered and otherwise reimbursed the Defendants for medical services evidenced on the bills submitted for reimbursement.

239.   As a direct and proximate cause of the foregoing paragraphs mentioned above, the Defendants have been unjustly enriched and, therefore, should be made to return all monies previously paid for by the Plaintiffs.

**WHEREFORE**, the Plaintiffs seek judgment as follows:

a.   Declaring that the Defendants are not entitled to No-Fault benefits from the Plaintiffs;

b.   Awarding Plaintiffs restitution in the full amount previously paid to the Defendants;

c.   Permanently staying any proceedings pending within the Circuit Court, and/or with any other tribunal involving the claims for No-Fault

- 54 -

benefits by or associated with the Defendants and enjoining said Defendants from filing new proceedings to collect No-Fault benefits from the Plaintiffs;

d.   Vacating all awards against Liberty Mutual and in favor of the Defendants entered with Circuit Court, or any other tribunal action;

e.   Staying the enforcement of all Arbitration Awards and Judgments that the Defendants have obtained against the Plaintiffs;

f.   Granting any other relief that the Court deems fair and appropriate.

## **CERTIFICATION**

I hereby certify that to my knowledge, the matter in controversy is not the subject of any other action pending in any Court proceeding.

I have no knowledge at this time of the names of any other party who should be joined in this action.

**MARSHALL DENNEHEY**

Dated:  April 17, 2024                       */s/ Jeffrey G. Rapattoni*
                                                              JEFFREY G. RAPATTONI (P81455)
                                                              15000 Midlantic Drive, Suite 200 · P.O. Box 5429
                                                              Mount Laurel, NJ 08057
                                                              Phone: (856) 414-6000  Fax: (856) 414-6077
                                                              jgrapattoni@mdwcg.com
                                                              Attorney for Plaintiffs

- 55 -

**LAW OFFICES OF GREIG, KENNEDY,
SEIFERT AND FITZGIBBONS**

By: /s/ *Steven M. Braun*
STEVEN BRAUN (P79461)
Attorney for Defendant
28411 Northwestern Hwy., Suite 640
Southfield, MI 48034
248-223-0120